**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

DONALD K. WASHBURN,

               Defendant.

No. 11-CR-100-LRR

**ORDER**

_____

### TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   RELEVANT PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . **2**

III.  RELEVANT FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . **4**

     A.    Schemes to Defraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
         1.    Dibocca scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
         2.    Mining scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
              a.    Beverly Mine. . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
              b.    Cumberland Mine. . . . . . . . . . . . . . . . . . . . . . . **13**
              c.    Black Feet Mine. . . . . . . . . . . . . . . . . . . . . . . . **16**
              d.    Willow Creek Placer Mine. . . . . . . . . . . . . . . . **17**
     B.    Monthly Supervision Reports. . . . . . . . . . . . . . . . . . . . . . . . . . **18**

IV.  MOTION FOR JUDGMENT OF ACQUITTAL. . . . . . . . . . . . . . . . . . . **18**

     A.    Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
     B.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
         1.    Dibocca scheme: Counts 1 through 8. . . . . . . . . . . . . . . . **19**
              a.    Count 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
              b.    Count 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
              c.    Counts 3, 7 and 8. . . . . . . . . . . . . . . . . . . . . . . **22**
              d.    Counts 4, 5 and 6. . . . . . . . . . . . . . . . . . . . . . . **24**
         2.    Mining scheme: Counts 10 through 30. . . . . . . . . . . . . . . **25**
              a.    Counts 10, 11 and 29. . . . . . . . . . . . . . . . . . . . **26**
               b.    Counts 12 through 21 and Count 30. . . . . . . . . . . . **28**

         *c.*     *Counts 22 through 28.* . . . . . . . . . . . . . . . . . . . . . . **29**

     *3.*     *Unlawful monetary transactions: Counts 32 through 36.* . . . . **29**

     *4.*     *False statements to the USPO: Counts 37 through 49.* . . . . . . **30**

**C.**     **Summary.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

**V.**     **MOTION FOR NEW TRIAL.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

**A.**     *Legal Standard.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

**B.**     *Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

     *1.*     *Weight of the evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

     *2.*     *Good-faith jury instruction.* . . . . . . . . . . . . . . . . . . . . . . **35**

     *3.*     *"Lulling" definition.* . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

     *4.*     *Voluntary absence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

     *5.*     *Admission of factual stipulation.* . . . . . . . . . . . . . . . . . . **42**

**C.**     **Summary.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

**VI.**     **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

## I.  INTRODUCTION

The matter before the court is Defendant Donald K. Washburn's "Combined Motion for Judgment of Acquittal and Motion for New Trial" ("Motion") (docket no. 140).

## II.  RELEVANT PROCEDURAL BACKGROUND

On September 28, 2011, the government filed a forty-nine count Second Superseding Indictment (docket no. 47) against Defendant. Counts 1 through 31 of the Indictment charged Defendant with wire fraud in violation of 18 U.S.C. § 1343. Counts 32 through 36 charged Defendant with engaging, causing to engage and attempting to engage in monetary transactions in criminally derived property in violation of 18 U.S.C. § 1957. Finally, Counts 37 through 49 charged Defendant with making false and fraudulent material statements, representations and omissions to the United States Probation Office ("USPO") in violation of 18 U.S.C. § 1001(a). The Indictment also contained forfeiture allegations.

On February 13, 2012, a jury trial on Counts 1 through 49 of the Second Superseding Indictment commenced. On February 16, 2012, at the close of the

government's evidence, Defendant moved for a judgment of acquittal. The court granted Defendant's motion as to Count 31. That same day, at the close of all of the evidence, Defendant again moved for a judgment of acquittal on the remaining forty-eight counts, which the court denied. On February 17, 2012, the day the court was to begin reading the final jury instructions, Defendant failed to appear. Defense counsel informed the court that he received a call from Defendant at 6:55 a.m., during which Defendant stated that he had accidentally shot himself with a nail gun. The court recessed to give the parties time to investigate. Several hours later, the court reconvened and held a hearing to determine whether Defendant had voluntarily absented himself from the trial, thereby waiving his right to be present. Following the hearing, the court determined that Defendant had intentionally injured himself, that he was therefore voluntarily absent and, consequently, the trial could proceed in his absence. The court revoked Defendant's pretrial supervised release and ordered that he be taken into custody as soon as he was released from the hospital. Although the court determined that it could proceed with the trial immediately, the court deemed it appropriate to exercise caution and continued the trial until February 21, 2012.[1] On that date, the trial resumed in Defendant's absence. Defendant was released from the hospital later that same morning, and he appeared in court in time to see defense counsel give his closing argument.

On February 22, 2012, the jury returned guilty verdicts on Counts 1 through 8, 10 through 30 and 32 through 49. The jury found Defendant not guilty on Count 9. On March 7, 2012, Defendant filed the Motion. On March 21, 2012, the government filed a Resistance (docket no. 145) to the Motion. Defendant did not file a reply and the time for doing so has expired. *See* LR 7(g). Thus, the Motion is fully submitted and ready for decision.

---

[1] Due to Washington's Birthday, the courthouse was closed on Monday, February 20, 2012.

## III. RELEVANT FACTUAL BACKGROUND[2]

Viewed in the light most favorable to the government, the trial evidence is as follows:

### A. Schemes to Defraud

Defendant was involved in two schemes to defraud—the Dibocca scheme and the mining scheme. The schemes operated in similar manners: Defendant claimed to have some property or an idea that was worth a substantial amount of money and he solicited investments in his property or idea. Rather than use the investments as promised, Defendant used the money for the benefit of himself and his family. In furtherance of the schemes, Defendant sent emails to lenders for the purpose of lulling them into a false sense of security and postponing inquiries or complaints.

### 1. Dibocca scheme

On May 16, 2005, Defendant was convicted of wire fraud and money laundering. The conviction arose out of two different schemes, one of which involved Defendant soliciting investments in a dice game. Defendant represented to these investors that he was going to sell the game and that he had four casinos that were already willing to purchase it. Defendant was sentenced to a twenty-seven month term of imprisonment followed by a three-year term of supervised release.

Following his release from prison and while still on supervised release pursuant to the Judgment in his prior case, Defendant again solicited lenders to invest in a dice game. One such investor was Michael Bauer, a resident of Wisconsin. Bauer met Defendant and his son, Chad Washburn, through Bauer's insulation business. In 2008, Chad told Bauer about a dice game called "Dibocca" that Chad was working on getting into the gaming industry. On May 17, 2008, Bauer and Chad entered into an "Exclusive License

_____

[2] When relevant, the court relies on and discusses additional facts in conjunction with its analysis of the law.

Agreement," which purported to grant Bauer the exclusive license to market and sell the game in casinos in the State of Wisconsin for the next five years. Agreement, Government Exhibit 19 (docket no. 130-4) at 1, 3. Although the agreement is signed by Chad, Defendant became Bauer's primary contact after the first month or two. Chad and Defendant represented to Bauer that they had a connection with a person in the Indian gaming industry and that this person would assist them in getting the game licensed in Wisconsin. At no time did Chad or Defendant notify Bauer that Defendant had a prior wire fraud conviction based on a dice game scheme. Bauer paid $324,000 for the license, which he wired to Dibocca Corporation. Bauer believed that the money would be used to buy felts and get the game licensed in Wisconsin. In fact, a series of checks written immediately following the deposit of the $324,000 showed that the money was used for various purposes, including a $243,220.86 wire transfer to Aircraft of Devine, purportedly to purchase an airplane, and a $15,342.87 loan to Polar Insulation, Chad's company.

In September 2008, Defendant told Bauer that he needed additional funds to secure a "CUSIP number" for the game. In response, Bauer wired $75,000 to Dibocca Corporation. Bauer understood that the entirety of his $75,000 would go toward securing a CUSIP number. In fact, a series of checks written immediately following the deposit of the $75,000 showed that the money was used for various purposes, including a $2,000 loan to Chad, a $5,000 commission payment to Defendant and a $3,000 loan to Defendant.

On October 19, 2008, Defendant sent an email to Bauer, which explained:

> We are waiting for the ISIN# as well as the CUSIP# for the Dibocca bonds for S&P. After talking to the lawyer on Friday, he informed us that they will be issued this week. Once that is done [i]t will be 10 to 15 days for the funds to start coming in[.]
>
> You will be paid off for your part of the license agreement Wisconsin of not less than $4,300,000.00 on or before Dec[.] 24, 2008 and $150,000.00 add on, for your part in helping get

> the prospectus done and completed. With out [sic] you it would not have been possible and that is a fact[.]
>
> Are [sic] intent is to have the Dibocca game also made into a [sic] eletrical [sic] device which will take sometime [sic] . . . . [F]or you being so kind in helping us, we will give to you the license for the state Wisconsin for the (electrical devices/slot machines) to be shared on a 50/50 bases [sic] with Dibocca at (NO) cost to you.

Email, Government Exhibit 55 (docket nos. 134-3 through 134-8) at 67. Contrary to the October 19, 2008 email, Bauer did not receive any funds by December 24, 2008.

On April 30, 2009, Defendant again emailed Bauer regarding the electronic version of Dibocca. The email indicated that Defendant had a buyer for the rights, who would "buy us out in 90 days from the date the first one goes in." Email, Government Exhibit 55 at 84. The email put the projected profits in the $5 to $10 million range. Upon receipt of the email, Bauer became excited at the prospect of such a large payout. However, Bauer never received the money.

On May 4, 2009, Bauer entered into an agreement with Defendant for the Dibocca simulcast—the electronic version of the game. The agreement provides, among other things:

> Where as [sic] Michael Bauer is investing $100,000.00 into a 50/50 joint venture agreement with Don Washburn on Simulcast . . . Dibocca in casinos in the United States of America. If this simulcast is sold for not less than $5,000,000.00 Washburn and Bauer will split in [sic] sell price 50/50. If Dibocca simulcast is not sold by August 1, 2009, Bauer can elect to receive his investment of $100,000.00 refund with 10% interest, which I Don Washburn will personally guarantees [sic].

Agreement, Government Exhibit 23 (docket no. 131-2) at 1. Bauer wired Defendant the $100,000 in four installments of $59,000, $31,000, $7,330 and $2,500 over the course of two days. Defendant instructed Bauer where to wire the money. The first three wires

were directed to the account of Dolores Washburn, Defendant's wife. Bauer sent the final wire by Western Union to what Bauer understood was an airport in the Cedar Rapids area; Defendant explained that he was on a plane because he had a business meeting with individuals in the gaming commission and he needed the money to get to Las Vegas. The wire was, in fact, sent to 323 Edgewood Road NW, Cedar Rapids, Iowa.

On July 23, 2009, Defendant sent an email to Bauer, which stated:

Mike as of the minute I'm so fucking mad at you I have decided to wright [sic] instead of calling you.

1. You and or know one [sic] else is going to make any kind of threat about me. Like going to the FBI for what ever [sic] reason that dog will not hunt.

2. I have worked my ass off getting this job done ~ yes you have help [sic] out, but the fucking greed has now taken over[.]

3. You have put in $325,000 in May of 08--$75,000 in Sept of 08 and $100,000 do [sic] know [sic] later than August 1 09 which comes up to [sic][.]

Just so you know there is over 200 million at Wells Faro [sic] Bank waiting to be released upon the insurance rap being delivered.

And further more [sic] just for your info I'm given [sic] up $2,230,000,000,000.00 just to get you and a few others out of my hair.

The deal with Mike Godin can not [sic] be blamed on us at all. Do I think he was tell [sic] the truth yes I done from what I now know and you talked to him your self [sic] (correct) and was very well satisfied.

That were [sic] the $75,000.00 went for[.]

The Dibocca deal for $324,000 was for the license agreement[.]

The $100,000 was for my part of Dibocca which is ((not due)) in till [sic] 8-1-09 correct[.]

> So I don't have know [sic] fucking clue what you are raisin [sic] hell for, if this were to take 5 years it is one hell of a deal for you[.]

> And because you were a friend this is why you are where you are today going to get back (((((1,500%)))* on your money[.]

> If you want this you can have the fucking thing just make sure you give Chad his part[.]

> Im [sic] done with ever one [sic].

Email, Government Exhibit 24 (docket no. 131-3) at 1 (emphasis removed). Bauer did not receive any money after this email.

Finally, on September 2, 2009, Defendant sent yet another email to Bauer, which referenced other deals and a return of over $7 million. There was a "Security and Pledge Agreement" attached to the email, but the form was blank. Bauer did not have any other deals with Defendant and did not know what the email was referencing.

Bauer has never been repaid any of the funds that he invested in Dibocca or the electronic version of the game. When the August 1, 2009 deadline referenced in the May 4, 2009 agreement passed, Bauer requested that Defendant repay him the $100,000 plus 10% interest. Defendant, however, never repaid the money. Furthermore, Bauer has never seen Dibocca or the electronic version of Dibocca in any casino.

### 2. *Mining scheme*

Defendant stipulated that he participated in the second scheme to defraud, which involved Defendant "falsely creating the appearance he was legitimately engaged in the mining business" and then "solicit[ing] funds for his purported mining activity from prospective investors and lenders." Factual Stipulation, Government Exhibit 16 (docket no. 130-1) at 3. Defendant created this false appearance, in part, by doing business as "Iron Ore International." *Id.* at 1-2. In furtherance of this scheme, Defendant "sought to lull his victims into a false sense of security, postpone inquiries or complaints, and make

the transactions less suspect by sending emails to the victims designed to falsely reassure them about the state of their investments, loans and/or interest payments." *Id.* at 3-4. Defendant stipulated that, through "false and fraudulent pretenses and representations," he "cheated his investors and lenders out of at least $325,375." *Id.* at 1, 4. The mining scheme involved four mines: (1) the Beverly Mine; (2) the Cumberland Mine; (3) the Black Feet Mine; and (4) the Willow Creek Placer Mine.

### a. Beverly Mine

The Beverly Mine is located in Western Australia and is owned by Cliff Duncan. In or around August 2009, John Falting, doing business as MexMin Pty Ltd ("MexMin"), contacted Duncan regarding purchasing the mineral rights to the Beverly Mine. However, Duncan did not sign any agreement granting MexMin the mineral rights. On August 9, 2009, Defendant sent an email claiming that he had been working with Falting to obtain the mineral rights but that Falting "did not get the farm to sign the lease." Email, Government Exhibit 55 at 91. On that same day, Defendant entered into a "Commercial Bill of Sale" with MexMin in which he "purportedly purchased 'one million metric tonnes of Iron Ore lump' located in Beverly in Western Australia for $72,000,000." Factual Stipulation, Government Exhibit 16 at 2. At this time, Duncan still owned the Beverly Mine. Furthermore, Defendant never paid the $72,000,000 referenced in the August 9, 2009 agreement. On December 7, 2009, Falting, on behalf of MexMin, sent Defendant a letter stating that Defendant's "right to the Beverly Iron Ore mine is terminated, through material default on [Defendant's] part." Letter, Government Exhibit 31 (docket no. 132-3) at 1. At no time did Defendant or MexMin ever own any rights to the Beverly Mine.

Despite his lack of any ownership interest, Defendant solicited Robert Lee,[3] a resident of Alaska, to invest in mining operations for the Beverly Mine. Defendant had

_____

[3] To avoid confusion, the court shall refer to Robert Lee as "Lee" and shall refer to Jeff Lee by his full name.

previously sold Lee shares in a gold mine located in Australia. The investment opportunity was through a corporation named Titan Holdings. The investment, however, proved unsuccessful. Nearly a year after the investment fell through, Defendant contacted Lee regarding the Titan Holdings shares. Defendant stated that he had a new money-making venture and he would be able to pay Lee $10 per share for the Titan Holdings shares. Defendant also presented Lee with an opportunity to invest in this new venture. Defendant explained that he owned the Beverly Mine in Western Australia, that the mine had high grade iron ore and that the ore was easily extractable because it was sitting on top of the mine. Defendant told Lee that he needed funds so that he could transport the ore to the port in Perth, Australia. Lee agreed to loan Defendant $60,000. On September 10, 2009, Defendant sent Lee an email with the wire information and stated, "Bob thank you for your help[.] 20 days max 120 return, if I good [sic] get this before noon my time I can get it back out and will start hauling ore on Saturday." Email, Government Exhibit 55 at 136 (emphasis removed). Attached to the email was an unsigned contract, which purported to be an agreement to sell the ore. Lee wired Defendant the $60,000 for the purpose of transporting the ore from the Beverly Mine to the port in Perth.

Defendant stipulated that "none of [Lee's] $60,000 was used as represented by [D]efendant, but rather was used for the benefit of [D]efendant and his family." Factual Stipulation, Government Exhibit 16 at 5. For example, within two days after receiving the $60,000 wire, Defendant transferred $20,000 to another account as security for a credit card in his name. An additional $20,000 was paid to Defendant's son's business account, then transferred to a second business account and ultimately used by Defendant's son to purchase items unrelated to the Beverly Mine. Defendant paid $15,000 to Investment Enterprises for an option to purchase his father's residence. An additional $8,021 went to pay attorney fees for Defendant's son. Defendant withdrew, in cash, additional amounts totaling $7,100.

Although Defendant had told Lee in the September 10, 2009 email that Lee would get a $120,000 return[4] in twenty days, Lee did not receive the money. Lee contacted Defendant, and, on October 3, 2009, Defendant sent an email to Lee in which he stated, "It looks like I can draw down on the LC on Monday or Wednesday. We have the LC OK/via [sic] Bank of America." Email, Government Exhibit 55 at 184 (emphasis removed). Defendant also represented to Lee that he would "be moving 150,000 MT ton [sic] per month to the dock in Perth[.] That's over 10 million per month, for the next 2 ½ years." Id. (emphasis removed). On October 13, 2009, Defendant sent another email to Lee in which he claimed, "We will have are [sic] funds some-time [sic] today—Fed Wire was closed yesterday." Email, Government Exhibit 26 (docket no. 131-5) at 1 (emphasis removed). Two days later, Defendant sent Lee another email claiming that the money was forthcoming. On October 29, 2009, Defendant once again emailed Lee and stated, "I have been with the lawyers all day and we are rapping [sic] it all up in about 6 hours. This is a lot of work." Email, Government Exhibit 55 at 199 (emphasis removed).

By November 3, 2009, Lee had still not received the money. At this time, Defendant sent an email to Lee in which he claimed that the government was holding up the iron ore deal because Defendant still owed $74,000 on a court fine. The email went on to state, "So if in fact you can find someone to purchase 75 thousand dollars with [sic] of the iron ore in the next 24 hours that 7 million that I have on the back side is yours." Email, Government Exhibit 55 at 200 (emphasis removed). In response to this request and after verifying with Defendant's attorney's office that Defendant in fact owed a court fine,

---

[4] The court notes that there is a discrepancy as to whether Defendant promised Bauer a $120,000 return or a 120% return. The September 10, 2009 email stated "120 return." Email, Government Exhibit 55 at 136. Bauer testified at trial that this meant $120,000—twice the amount of his investment. However, Defendant stipulated that the email reference to "120 return" meant a 120% return. See Factual Stipulation, Government Exhibit 16 at 4.

Lee contacted his brother, Jeff Lee, who agreed to wire Defendant the $74,000. It was the Lees' understanding that Defendant's court fine was $74,000 and that all of Jeff Lee's wire transfer would be used to pay off the fine. On November 4, 2009, Jeff Lee wired the $74,000 to Defendant. Following the $74,000 wire transfer, Defendant wrote a check to the United States Clerk of Court paying off his fine, which was only $71,730.24, and then withdrew $2,000 in cash.

After his brother had wired the money to Defendant, Lee requested that Defendant send him an agreement listing all the loans that the Lees had given Defendant and the returns Defendant owed them. On November 16, 2009, Defendant prepared the agreement. The agreement reflected that Lee had lent Defendant $60,000 and Defendant was to repay Lee $120,000. The agreement also reflected Jeff Lee's loan of $75,000,[5] which Defendant would use "to pay off a government fine which was done and paid infull [sic]," and further stated that, in return, Defendant would pay Lee $7 million. Agreement, Government Exhibit 30 (docket no. 132-2) at 1 (emphasis removed). Finally, the agreement provided that Defendant would pay $10 per share on the Titan Holdings shares.

On December 10, 2009, Defendant sent Lee another email, which stated that "the prof [sic] of funds is being done to day [sic]" and represented to Lee that payment would be forthcoming. Email, Government Exhibit 55 at 222 (emphasis removed). After Lee still had not received any money, he contacted Defendant again. On December 25, 2009, Defendant responded via email, in which he claimed that "the funds were being converted to US Treasure [sic] Notes" and noting that "things well [sic] be very good for us shortly." Email, Government Exhibit 55 at 229 (emphasis removed). On January 7, 2010, Defendant once again emailed Lee and claimed that Defendant had received confirmation of the Treasury Notes being issued.

---

[5] Jeff Lee had, in fact, only wired Defendant $74,000.

When the funds were still not forthcoming, Lee began investigating whether Defendant owned the Beverly Mine. On February 21, 2010, Lee contacted Falting. Falting forwarded Lee's email to Defendant. On March 3, 2010, Defendant responded to Lee and told him, "Well it looks like you sure are not my friend after all Bob. I now know why the government is doing to [sic] bullshit again. You will be out of my fucking [sic] before the end of tomorrow." Email, Government Exhibit 55(b) (docket no. 134-10) at 1 (emphasis removed). Defendant responded again on the same day, this time telling Lee to "[c]heck all you want." Email, Government Exhibit 55(c) (docket no. 134-11) at 1 (emphasis removed).

In approximately June 2010, Lee contacted the Federal Bureau of Investigation's office in Anchorage, Alaska. Agent Shauntay Lett was assigned the case and proceeded to investigate. On July 31, 2010, Defendant once again emailed Lee claiming that "Tom Riley Law Firm . . . is doing the collection for me and should be done some time [sic] this week." Email, Government Exhibit 55 at 391 (emphasis removed). Attached to the email was a "Purchase Deed and Sale Agreement" relating to a different mine—the Cumberland Mine. Pursuant to the agreement, Iron Ore International was selling the Cumberland Mine to Stanley Christopher for $750 million. Lee, however, never received any funds from this purported sale.

### b.    *Cumberland Mine*

The Cumberland Mine is located in Colorado. In approximately 2010, Defendant contacted H.K. Stanfield, who, at that time, owned the Cumberland Mine. After a series of emails discussing the mine, Defendant, on behalf of Iron Ore International, entered into a "Contract for Deed and Purchase and Sale Agreement" in which Defendant purportedly purchased the Cumberland Mine for $950,000. Agreement, Government Exhibit 43 (docket no. 133-6) at 1. Pursuant to the agreement, Defendant made a $10,000 down payment. However, as Defendant stipulated, Defendant never completed the purchase of

the mine. Although neither Defendant nor Iron Ore International had any ownership interest in the Cumberland Mine, on or about July 6, 2010, Defendant, on behalf of Iron Ore International, entered into a contract to sell the Cumberland Mine to Stanley Christopher for $750,000,000. In the agreement, Defendant represented that he owned all right, title and interest to the patented mining and mill site claims. Following his July 6, 2010 agreement to sell the mine to Christopher, Defendant repeatedly promised or offered to sell the Cumberland Mine to various other individuals. Defendant, however, never acquired any right to the mine.

Despite his lack of ownership interest in the Cumberland Mine, Defendant solicited individuals to invest in the mine. Ralph Keith McClure,[6] a resident of Ohio, was one such investor. McClure entered into a "Funding Agreement" whereby he loaned Defendant $1,500 to be used "to help fund the Cumberland [M]ines project." Agreement, Government Exhibit 36 (docket no. 132-8) at 1. In exchange, Defendant would repay McClure twice the amount loaned. On May 27, 2010, McClure wired Defendant the $1,500. Within a week or two, Defendant repaid the money. Defendant went to Ohio and presented McClure with a check for $7,500.

Defendant then told McClure about additional investment opportunities and asked McClure to recruit individuals who could invest money. McClure himself reinvested $5,000 to be used to "help fund the Cumberland [M]ines project." Agreement, Government Exhibit 39 (docket no. 133-2) at 1. Several other individuals, including Kimberly Bly, Frank Hill, Eric Gladman, Timothy Fisher and Robert McClure, learned about the opportunity from McClure and entered into similar funding agreements. All of the funding agreements specified that the money was to be used "to help fund the Cumberland [M]ines project." Agreement, Government Exhibit 40 (docket no. 133-3) at

---

[6] To avoid confusion, the court shall refer to Ralph Keith McClure as "McClure" and shall refer to Robert McClure by his full name.

1; Agreement, Government Exhibit 41 (docket no. 133-4) at 1; Agreement, Government Exhibit 42 (docket no. 133-5) at 1; Agreement, Government Exhibit 61 (docket no. 135-5) at 1; Agreement, Government Exhibit 62 (docket no. 135-6) at 1. Defendant told some of these investors that there was a minimum investment of $5,000. McClure's understanding was that Defendant would repay the initial investment amount plus an additional amount equal to five times the initial investment.

The funding agreements were nearly identical one-page documents. Attached to some of the funding agreements, including Robert McClure's agreement, was a document listing four separate mines: Cumberland, Snowstorm, Cora G and Monitor. McClure, who invested the money on behalf of his son, Robert McClure, testified that he understood the money would go toward preparing the requisite paperwork and testing so Defendant could sell the Cumberland Mine.

McClure proceeded to make additional investments. On July 1, 2010, McClure wired Defendant $25,000. Defendant represented to McClure that he needed the additional funds to close on the mine. On July 2, 2010, McClure wired Defendant an additional $10,000, which was also to be used to close on the mine, as well as for travel. Following these investments, Defendant told McClure to prepare an accounting of all the loans, which McClure did through his wife. The accounting listed the total amounts loaned by McClure, Robert McClure, Hill, Fisher, Bly and Gladman. In addition to the loan amounts, the accounting also included a column reflecting the total promised return—the initial loan amount plus a return of five times the initial loan amount.

Defendant failed to repay McClure the amount reflected in the accounting. McClure met with Defendant on three or four occasions to receive payment, but no money was forthcoming. On one such occasion, Defendant gave McClure Iraqi dinar and claimed that McClure needed only to take it to the Federal Reserve and cash it in. Defendant further claimed that each dinar was worth seven to eight times the $10,000 denomination

15

on the bill.  When McClure took the dinar to the Federal Reserve, however, it was worth only $32.

Other than McClure's initial return of $7,500, he received no other money from Defendant.  Two of the other individuals, Fisher and Bly, also testified that Defendant failed to repay their investments.  Bly, however, noted that Defendant had told her that the deal on the mine closed at the end of December 2011 or January 2012, just a month or two before the trial, and that her money was forthcoming.

### c.    *Black Feet Mine*

Defendant also solicited an investment in the Black Feet Mine from Sue Hanna, a resident of Nevada.  Hanna had previously been employed by a Las Vegas company that manufactured cloths for game tables in casinos.  This company had printed cloths for Dibocca Corporation, and Hanna had met Defendant at that time.  Ultimately, Hanna agreed to invest $20,000 in the Black Feet Mine.  On February 11, 2009, Defendant sent Hanna an email:

> Thanks for the info: we are just finishing up my deal with Henry for the [B]lack [F]eet deal. [W]ill be e-mail [sic] you the agreement tonight and or I will fax it to you.  Do you still have a fax no?? [T]hen I will give you the bank info to make the 20 thousand dollars wire transfer tomorrow[.]

Email, Government Exhibit 55 at 70.[7]  Two days later, Defendant emailed Hanna and instructed her to wire the money to his wife's bank account.  On February 17, 2009, Hanna wired $20,000 from her bank in Nevada to Defendant's wife's bank account.  Hanna believed the money would be used for the Black Feet deal.  The day after the wire was deposited into Defendant's wife's account, there was a total of $17,616 withdrawn,

---

[7] The court notes that the jury found Defendant not guilty of Count 9, which related to this email.

including a $4,000 check made payable to Defendant, two $5,000 checks made payable to Defendant and a $3,616 check made payable to Linn County Treasurer.

Approximately six months later, on August 19, 2009, Defendant sent an email to Hanna, which stated, "This is being sold today and funds are being sent to the Vegas account so you can pick them up there." Email, Government Exhibit 55 at 105 (emphasis removed). Attached to the email was a "Commercial Bill of Sale" that listed MexMin as the seller and Iron Ore International as the buyer of "Iron Ore lump." *Id.* at 106. Exhibit 1 of the Bill of Sale purported to list the "Collective Assets Referenced in this Bill of Sale" as "One million only (1,000,000) metric tonnes of Iron Ore lump at mine gate, with a minimum $Fe_2O_3$ [sic] content of 70% situated at Beverley [sic] in Western Australia." *Id.* at 108. Hanna, however, did not receive any funds following this email.

Nearly a year later on July 31, 2010, Defendant once again emailed Hanna:

> I [sic] has been a bitch getting my money—but it is to be done this week . . . just don't [sic] know the day and time[.]
>
> Just want to give you a head's up.
>
> You will be fine I will make sure of that—you are my friend—and you [sic] going to owe me a chocolate malt—LOL.

Email, Government Exhibit 55 at 414 (emphasis removed). Hanna, however, never received any money.

### d. *Willow Creek Placer Mine*

The Willow Creek Placer Mine is located in Pershing County, Nevada, and is owned by Raymond Bluff. On February 19, 2010, Defendant entered into an agreement with Bluff to purchase the Willow Creek Placer Mine for $2,500,000. Defendant stipulated, however, that he never completed the purchase of the mine. Despite his lack of any ownership interest, Defendant attempted to solicit investments through Jean Ferguson, who was interested in finding investment opportunities for friends. However,

Ferguson did a compliance check and found out Defendant did not own the Willow Creek Placer Mine.

## B. Monthly Supervision Reports

As noted above, on May 16, 2005, Defendant was convicted of wire fraud and money laundering and sentenced to a twenty-seven month term of imprisonment followed by three years of supervised release. In addition, the court imposed a $90,000 fine. Defendant's term of supervised release began in 2007. Pursuant to a standard condition of supervised release, Defendant was required to provide written reports within the first five days of each month. In these reports, Defendant was required to disclose information about his employment, bank account, income, expenditures and financial transactions. The USPO was particularly interested in Defendant's finances because he still owed a court fine. In 2010, Defendant was discharged from supervised release.

Following Defendant's discharge from supervised release, the government subpoenaed Defendant's monthly supervision reports in connection with its investigation of Defendant for wire fraud. A comparison of the monthly supervision reports with various bank records showed that Defendant had made false statements in or omitted information from the reports.

## IV. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Legal Standard

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Such a motion is permitted after trial, in which case the court may set aside the verdict and enter a judgment of acquittal. *Id.* at 29(c). It is well-settled that jury verdicts are not lightly overturned. *See, e.g.*, *United States v. Peneaux*, 432 F.3d 882, 890 (8th Cir. 2005); *United States v. Stroh*, 176 F.3d 439, 440 (8th Cir. 1999). The court must view the evidence in the light most

favorable to the government and give the government the benefit of all reasonable inferences. *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). The court must uphold the jury's verdict so long as a reasonable-minded jury could have found the defendant guilty beyond a reasonable doubt. *Id.* Moreover, the court "must uphold the jury's verdict even where the evidence 'rationally supports two conflicting hypotheses' of guilt and innocence." *Id.* (quoting *United States v. Serrano-Lopez*, 366 F.3d 628, 634 (8th Cir. 2004)). It is not the province of the court to evaluate the credibility of witnesses—that task is for the jury. *United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004).

## B. Analysis

In his Brief in Support of the Motion, Defendant argues that there was insufficient evidence to support the jury's guilty verdicts as to: (1) Counts 1 through 8, which relate to the Dibocca scheme; (2) Counts 10 through 30, which relate to the mining scheme; (3) Counts 32 through 36, which are the unlawful monetary transaction counts; and (4) Counts 37 through 49, which are the false statements to the USPO counts.

### 1. Dibocca scheme: Counts 1 through 8

Defendant argues that there is insufficient evidence to support the jury's guilty verdicts on Counts 1 through 8, which charged Defendant with wire fraud. "'The essential elements of wire fraud are a scheme to defraud, the use of interstate wires incident to the scheme, and an intent to cause harm.'" *United States v. Farrington*, 499 F.3d 854, 859 (8th Cir. 2007) (quoting *United States v. Edelmann*, 458 F.3d 791, 812 (8th Cir. 2006)); *see also United States v. Louper-Morris*, 672 F.3d 539, 555-56 (8th Cir. 2012) (outlining elements of wire fraud). "'Intent to defraud may be inferred from all the facts and circumstances surrounding the defendant's actions.'" *Farrington*, 499 F.3d at 859 (quoting *United States v. Schumacher*, 238 F.3d 978, 980 (8th Cir. 2001)).

The court notes that Defendant does not contest that Bauer wired money, as alleged in Counts 1, 2, 4, 5 and 6, and Defendant does not contest that he sent the emails at issue

in Counts 3, 7 and 8. Rather, Defendant's arguments as to each count pertain to the existence of a scheme to defraud, intent to defraud and whether the use of the interstate wire facility was in furtherance of the scheme to defraud. The court will address Defendant's arguments under each count.

### a.    Count 1

As to Count 1, which relates to Bauer's wire of his initial investment of $324,000, Defendant argues that there is no evidence of what Defendant said, if anything, prior to Bauer wiring the money because Chad was the one who approached Bauer regarding the investment. Next, Defendant claims that it was Bauer who "solicited the licensing agreement." Brief in Support of Motion (docket no. 140-1) at 4. Defendant further argues that Dibocca is a real, patented game and he suggests that the failure of the investment may owe to Bauer's failure to carry out his obligations under the Exclusive License Agreement. The court finds that Defendant's arguments are unavailing.

There was sufficient evidence to conclude that Defendant participated in a scheme to defraud and that he had the requisite intent to defraud. Although it was Chad, not Defendant, who first approached Bauer regarding the game and was the signer on the Exclusive License Agreement, Bauer testified that the Washburns, collectively, told him that they were in the process of getting the game licensed and had a contact in the Indian gaming industry. Defendant became Bauer's primary contact after the first month or two, and Defendant's subsequent communications with Bauer suggested that Dibocca was a joint effort involving Defendant and Chad. For example, the October 19, 2008 email was sent from Defendant's email address and signed by both Defendant and Chad. *See* Email, Government Exhibit 55 at 67. Together, Defendant and Chad represented to Bauer that Dibocca was worth a substantial amount of money and that Bauer stood to earn a considerable return by investing in the game. Bauer believed that Defendant and Chad would use his $324,000 initial investment to get the game licensed and started in

Wisconsin. However, as reflected in Dibocca Corporation's bank records, the money went toward the purchase of an airplane and into the bank account of Chad's company. *See United States v. Ramirez*, 196 F.3d 895, 897 (8th Cir. 1999) (finding that there was sufficient evidence to uphold a wire fraud conviction where the defendant told investors he would invest the money in a corporation producing electric cars but, in fact, used the money for personal expenditures). At no time did either Chad or Defendant inform Bauer that Defendant had a prior conviction for wire fraud involving a dice game similar to Dibocca.

It is irrelevant whether, as Defendant claims, Dibocca is a real, patented game. Defendant represented to Bauer that Bauer's investment would be used to get the game going in Wisconsin. Defendant did not use the money in the manner he represented and Bauer testified that, to his knowledge, the game has never been in a casino in Wisconsin. Based on these facts, a reasonable jury could conclude that Defendant participated in a scheme to defraud and that he had the requisite intent to defraud. Thus, the court finds that there was sufficient evidence for a reasonable jury to find that Defendant committed wire fraud as charged in Count 1.

### b.    *Count 2*

As to Count 2, which relates to Bauer's $75,000 investment for the CUSIP number, Defendant incorporates his arguments under Count 1. Defendant further claims that Bauer's testimony is "devoid of reliable corroboration." Brief in Support of Motion at 5. The court disagrees. At the outset, a witness's testimony need not be corroborated. *See United States v. Jefferson*, 652 F.3d 927, 930 (8th Cir. 2011) ("Witness testimony . . . does not need to be corroborated."), *cert. denied*, 132 S. Ct. 1068 (2012). Furthermore, Bauer's testimony was corroborated by Defendant's subsequent October 19, 2008 email that referenced the CUSIP number. Although Defendant claimed he needed the additional $75,000 to get a CUSIP number, the evidence established that the money was used for a

variety of purposes, including loans to Defendant and Chad and a "commission" payment to Defendant. Farmers State Bank Records, Government Exhibit 2 (docket no. 123-2 through 123-3) at 52. Thus, the court finds that there was sufficient evidence for a reasonable jury to find that Defendant committed wire fraud as charged in Count 2.

### c. Counts 3, 7 and 8

Counts 3, 7 and 8 relate to emails Defendant sent to Bauer on October 19, 2008, July 23, 2009, and September 2, 2009, respectively. First, Defendant contends that these "lulling" emails cannot stand because there is no predicate fraud. Brief in Support of Motion at 5. Next, Defendant argues that "[t]here is a dearth of evidence as to when if ever Bauer expected [a] return on his investment." *Id.* Finally, Defendant contends that his statements as to Bauer's projected investment return—a $4.3 million return in the October 19, 2008 email, a 1,500% return in the July 23, 2009 email and $7,060,000 return in the September 2, 2009 email—were not false; rather, he was simply overly confident that the game would be successful. However, Defendant also argues that these returns are so extraordinary that a reasonable person could not have believed them to be true and, thus, Defendant's representations could be not deemed "material." *Id.* at 5-6. The court finds that Defendant's arguments are unpersuasive.

Wire communications that are designed to "'lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect'" are communications in furtherance of the fraudulent scheme. *United States v. Washburn*, 444 F.3d 1007, 1012 (8th Cir. 2006) (quoting *United States v. Tackett*, 646 F.2d 1240, 1243 (8th Cir. 1981)). The court finds that, as discussed above regarding Counts 1 and 2, a scheme to defraud did exist and the emails in Counts 3, 7 and 8 furthered that scheme. Defendant's October 19, 2008 email, the basis for Count 3, furthered the scheme by attempting to lull Bauer into a false sense of security—Defendant promised Bauer a specific return ($4.3 million and a $150,000 "add on") on a specific date (December 24, 2008).

In the same email, Defendant also suggested that Bauer would get even more money for the electronic version of the game. Similarly, Defendant's July 23, 2009 email, the basis for Count 7, furthered the scheme by attempting to lull Bauer into a false sense of security or postpone inquiries or complaints. In the email, Defendant claimed that Bauer was acting unreasonably, a claim Bauer denied both in his response to Defendant's email and at trial, and Defendant stated that, if Bauer would be patient, he would get a substantial return. Finally, Defendant's September 2, 2009 email, the basis for Count 8, once again promised a substantial return. Thus, the court finds that these emails furthered Defendant's scheme to defraud.

Next, Defendant appears to make two contrary arguments—Defendant believed that the game would, realistically, produce such high returns, but, at the same time, such returns are so unrealistic that a reasonable person would not believe them. The court first notes that there is no requirement that a "lulling" communication be successful. *United States v. Evans*, 473 F.3d 1115, 1122 (11th Cir. 2006) ("[T]he success of the lulling effort is immaterial."); *see also United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009) (holding that eighteen calls from the defendant to the victim furthered the scheme to defraud even though the victim "was already suspicious and had already contacted law enforcement" by the time the defendant made the calls). The relevant inquiry is whether Defendant intended the emails to lull Bauer into a false sense of security or postpone inquiries or complaints. *See Tackett*, 646 F.2d at 1240 (noting that a communication may be in furtherance of the scheme if it is "designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect"); *see also United States v. Daniel*, 329 F.3d 480, 489 (6th Cir. 2003) ("In this case we similarly find that the relevant inquiry is whether [the defendant] intended the letter to lull concerns, and it matters not that the letter turned out to have the opposite effect."). As explained above,

a reasonable jury could have concluded that Defendant intended these emails to placate Bauer and allay his concerns when his return was not forthcoming.

Furthermore, based on Defendant's prior representations regarding Dibocca's potential worth, Bauer could have reasonably believed, at a minimum, that he stood to make $4.3 million and that, as promised in the October 19, 2008 email, he would receive those funds by December 24, 2008. The fact that, following the October 19, 2008 email, Bauer proceeded to give Defendant $100,000 to be used to develop the electronic version of Dibocca demonstrates that he still had faith in the profitability of the game.

Thus, the court finds that there was sufficient evidence for a reasonable jury to find that Defendant committed wire fraud as charged in Counts 3, 7 and 8.

### d.    Counts 4, 5 and 6

Counts 4, 5 and 6 pertain to Bauer's wire transfers of $59,000, $31,000 and $7,330 pursuant to the Dibocca simulcast agreement. As to these counts, Defendant argues that Bauer's testimony "was spotty on these details, not to mention biased as he stands to gain from a [g]overnment conviction. . . . Moreover, . . . Bauer acknowledged there was no limitation on the use of the funds he wired." Brief in Support of Motion at 6. The court will not disturb the jury's assessment of Bauer's credibility. *See United States v. Engler*, 521 F.3d 965, 973 (8th Cir. 2008) ("A district court must consider a motion for judgment of acquittal with 'very limited latitude' and must neither assess the witnesses's credibility nor weigh the evidence." (quoting *United States v. Johnson*, 474 F.3d 1044, 1048 (8th Cir. 2007))); *see also United States v. Bradley*, 643 F.3d 1121, 1125 (8th Cir. 2011) ("[The defendant's] arguments are properly characterized as attacks on the jury's credibility determinations, which are 'virtually unassailable on appeal.'" (quoting *United States v. Samuels*, 611 F.3d 914, 917 (8th Cir. 2010), *cert. denied*, 131 S. Ct. 1583 (2011))). Furthermore, the court disagrees with Defendant's assertion that "Bauer acknowledged there was no limitation on the use of the funds he wired." Brief in Support

of Motion at 6. Bauer repeatedly testified that Defendant told him that his investments would go toward developing and licensing the electronic version of Dibocca, and a reasonable jury could conclude that Defendant did not use Bauer's funds as promised. Thus, the court finds that there was sufficient evidence for a reasonable jury to find that Defendant committed wire fraud as charged in Counts 4, 5 and 6.

### 2. Mining scheme: Counts 10 through 30

Next, Defendant argues that there is insufficient evidence to support the jury's guilty verdicts on Counts 10 through 30, which charged Defendant with wire fraud. To find Defendant guilty of Counts 10 through 30, the jury was required to find that Defendant participated in a scheme to defraud, he had the intent to defraud and interstate wire facilities were used in furtherance of the scheme to defraud. *See Farrington*, 499 F.3d at 859.

As explained above, Defendant stipulated that he participated in a scheme to defraud by "falsely creating the appearance he was legitimately engaged in the mining business." Factual Stipulation, Government Exhibit 16 at 3. Defendant further stipulated that he solicited funds by falsely representing to prospective investors that the funds would go toward purchasing mines, operating mines or transporting minerals. Finally, Defendant stipulated that, when he solicited these funds, he did not intend to use the money for mining purposes, but, rather, he intended to use the money for the benefit of himself and his family. While Defendant specifically stipulated to the facts underlying Counts 12 and 13, he also stipulated that, in total, he "cheated his investors and lenders out of at least $325,375" and that there were at least ten investors, including "RL & JL from Alaska, SH from Nevada, KM, RM, FH, EG, and KB (all from Ohio), TB, SD, and LM (all from Iowa)." *Id.* The court finds that this stipulation, in conjunction with the other evidence at trial, provided sufficient evidence to support the jury's guilty verdicts as to Counts 10 through 30. Nonetheless, the court shall address each of Defendant's arguments in turn.

### a.     Counts 10, 11 and 29

Defendant first argues that there is insufficient evidence to support the jury's guilty verdicts on Counts 10, 11 and 29, which relate to victim Hanna. Defendant makes three arguments. First, he claims that, because Hanna did not testify on behalf of the government, the only evidence underlying the counts is documentary evidence, which is insufficient to support the guilty verdicts. Second, he claims that the jury's not guilty finding as to Count 9, which arose out of an email from Defendant to Hanna, "impeaches the convictions on the balance of the . . . Hanna counts." Brief in Support of Motion at 7. Lastly, Defendant argues that, because there is insufficient evidence to support Counts 9 and 10, "the predicate fraud does not exist for a 'lulling' conviction in Counts 11 and 29," and, furthermore, the statements Defendant made in the emails that are the subject of Counts 11 and 29 were not false. *Id.* at 7-8. The court finds that Defendant's arguments are unavailing.

The court will address Defendant's first two arguments together. Although Defendant "attempts to characterize his argument as a sufficiency of the evidence claim, his argument is actually an inconsistent verdict claim." *United States v. Suppenbach*, 1 F.3d 679, 681 (8th Cir. 1993). "The only relevant question when reconciling inconsistent verdicts . . . is whether there was enough evidence presented to support the conviction." *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998). For example, in *Whatley*, the Eighth Circuit Court of Appeals upheld a jury verdict finding the defendant guilty of money laundering, even though the jury also found the defendant not guilty of the underlying wire fraud charges. *Id.* at 605-06. The Eighth Circuit noted:

> Inconsistent verdicts are not, on their own, sufficient grounds for reversal or a new trial. A jury may acquit a defendant as to one or more charges for any number of reasons, including an inclination to be merciful, and yet come to the reasonable conclusion that the defendant was guilty of other related charges.

*Id.* at 606 (citing *United States v. Powell*, 469 U.S. 57, 64-65 (1984) (holding that inconsistent verdicts is not a basis for a new trial)).

Assuming without deciding that the jury's not guilty verdict on Count 9 is inconsistent with the jury's guilty verdicts on Counts 10, 11 and 29, the court nevertheless finds that there is sufficient evidence to support the jury's guilty verdicts on Counts 10, 11 and 29. First, the court notes that Defendant stipulated that he was involved in a mining scheme to defraud and that SH, who Agent Lett identified as Hanna, was one of his victims. The evidence at trial, even ignoring the facts underlying Count 9, establish that Defendant sent Hanna an email providing her with his wife's bank account information. Four days later, Hanna wired $20,000 from her bank account into Defendant's wife's bank account. Approximately six months after the wire transfer, Defendant sent Hanna an email in which he claimed that the Beverly Mine was being sold and he would send funds to the "Vegas account" for her to pick up. Email, Government Exhibit 55 at 105. Based on these facts, a reasonable jury could conclude that Hanna was one of Defendant's mining scheme victims.

Defendant's third argument is that the "lulling" counts, Counts 11 and 29, cannot stand because there is no predicate fraud and Defendant made no false representations in the communications. Brief in Support of Motion at 7-8. For the reasons previously stated, the court finds that there was a predicate fraud. The emails that are the subject of Counts 11 and 29 represented that Hanna's funds were forthcoming. A reasonable jury could easily conclude that these statements were false and designed to lull Hanna into a false sense of security or postpone inquiries or complaints.

Thus, the court finds that there was sufficient evidence for a reasonable jury to find that Defendant committed wire fraud as charged in Counts 10, 11 and 29.

### b.      Counts 12 through 21 and Count 30

Next, regarding Counts 12 through 21 and Count 30, which relate to victims Lee and Jeff Lee, Defendant claims that he made no false statements. Furthermore, regarding Count 18, Defendant argues that he used the money as he represented he would—he applied it to his court fine. The court disagrees.

First, Defendant stipulated that, regarding Counts 12 and 13, he made false statements to Lee. Specifically, Defendant stipulated that he falsely represented to Lee that Lee's investment would be returned in twenty days with a maximum 120% return and that, thanks to Lee's investment, Defendant would be hauling ore from the Beverly Mine that Saturday. Defendant further stipulated that he did not use Lee's $60,000 investment for mining purposes. With the exception of Count 18, which the court will address in more detail, the remainder of the counts are "lulling" communications in which Defendant represented to Lee that payment was forthcoming. A reasonable jury could conclude that Defendant sent these emails in an effort to provide Lee with a false sense of security or to delay or postpone inquiries or complaints.

Count 18 is based on the $74,000 wire transfer from Lee's brother, Jeff Lee, to Defendant. Defendant had represented to Lee that his mining deal was being held up by the government because he had an outstanding court fine. Lee testified that Defendant told him that the fine was $74,000. The fine, however, was only $71,730.24, and, following the deposit of the $74,000, Defendant withdrew $2,000 in cash. A reasonable jury could conclude that Defendant falsely represented to Lee that Defendant's purported mining deal could not go through, and, thus, he could not pay Lee, until he paid his court fine. Furthermore, a reasonable jury could conclude that Defendant misrepresented the amount of the fine, and, consequently, Jeff Lee's wire transfer was in excess of the amount of the fine, which enabled Defendant to withdraw $2,000 in cash to use for his own benefit.

Thus, the court finds that there was sufficient evidence for a reasonable jury to find that Defendant committed wire fraud as charged in Counts 12 through 21 and Count 30.

### c.    *Counts 22 through 28*

Finally, Defendant argues that there is insufficient evidence to support the jury's guilty verdicts as to Counts 22 through 28, which relate to the Cumberland Mine and victims McClure, Robert McClure, Hill and Gladman.[8]  The court disagrees.  The evidence at trial established that Defendant represented to McClure and the other victims that he owned the Cumberland Mine and that he needed funds for mining operations and/or to prepare the mine for sale.  Defendant, in fact, never owned the Cumberland Mine.  Furthermore, Defendant stipulated that he defrauded investors KM, RM, FH and EG—McClure, Robert McClure, Hill and Gladman.  Based on these facts, the court finds that there was sufficient evidence for a reasonable jury to find that Defendant committed wire fraud as charged in Counts 22 through 28.

### 3.    *Unlawful monetary transactions: Counts 32 through 36*

Defendant argues that, "[b]ecause the predicate wire frauds lack sufficient evidence, the money laundering convictions cannot stand."  Brief in Support of Motion at 9.  "The money laundering statute[, 18 U.S.C. § 1957,] prohibits anyone from knowingly engaging 'in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity.'"  *United States v. Hare*, 49 F.3d 447, 451 (8th Cir. 1995) (quoting 18 U.S.C. § 1957(a)).  Defendant's only argument is that the property in question was not criminally derived because there is insufficient evidence to support the wire fraud counts.  The court has already determined that there is sufficient evidence to uphold the jury's guilty verdicts on Counts 1 through 8 and 10

---

[8] The court notes that Count 25 relates to a wire transfer from McClure's business. At trial, McClure testified that Gladman had given him $10,000 to invest with Defendant, as evidenced by a funding agreement Gladman signed. *See* Agreement, Government Exhibit 41 at 1.

through 30, and the court finds that the other elements under 18 U.S.C. § 1957 are satisfied. Thus, the court shall deny Defendant's Motion for Judgment of Acquittal as to Counts 32 through 36.

### 4. *False statements to the USPO: Counts 37 though 49*

Defendant argues that there is insufficient evidence to support the jury's guilty verdicts on Counts 37 through 49. Although he does not cite to any particular count, Defendant argues generally that the government's theory was that Defendant failed to turn in attachments to his monthly supervision reports. Defendant further argues that United States Probation Officer Amber Lupkes, who laid the foundation for admission of Defendant's monthly supervision reports into evidence, neither supervised nor had any interaction with Defendant during the time period from which the charges arise, and, thus, Officer Lupkes does not have personal knowledge as to whether Defendant turned in any attachments. Furthermore, Defendant contends that Officer Lupkes testified that the USPO does not have a standard practice for handling attachments and she "readily acknowledged Defendant['s] . . . [a]ttachments could have been misfiled or lost." Brief in Support of Motion at 10. Finally, Defendant notes that the government failed to charge Defendant "for absent [a]ttachments in November 2008 through January 2009, March 2009 through April 2009, and November 2009," which Defendant claims "highlights further weaknesses" in the false statement counts. *Id.* The court finds that Defendant's arguments are unavailing.

To prove that a defendant made a false statement to a federal agency in violation of 18 U.S.C. § 1001(a), the government must show: "'(1) the defendant made a statement; (2) the statement was false, fictitious or fraudulent as the defendant knew; (3) the defendant made the statement knowingly and willfully; (4) the statement was within the jurisdiction of a federal agency; and (5) the statement was material.'" *United States v. McKanry*, 628 F.3d 1010, 1018 (8th Cir.) (quoting *United States v. Rice*, 449 F.3d 887,

892 (8th Cir. 2006)), *cert. denied*, 131 S. Ct. 1837 (2011). The court first notes that Defendant does not dispute that the alleged financial transactions and dealings, such as expenditures in excess of $500, took place. Furthermore, Defendant apparently concedes that he was required to turn in monthly supervision reports, it is within the jurisdiction of the USPO to require him to do so and Defendant's financial situation was material to the USPO. Defendant only argues that there is insufficient evidence that he failed to report these financial transactions and dealings to the USPO.

First, as the government notes in its Resistance, the government did not charge Defendant with failing to turn in attachments to his monthly supervision reports; rather, the Second Superseding Indictment charges Defendant with making false statements to the USPO. Indeed, several of the counts charged that he made a false statement on the report itself, not that he omitted information from the report. For example, Count 42 charged Defendant with, among other things, falsely claiming in his May 2009 Monthly Supervision Report that he "did not have a checking/savings account when, in fact, on May 12, 2009, he opened a Veridian Credit Union Member Equity Savings and Share Draft Account and had a balance of $20.00 on June 31, 2009." Second Superseding Indictment at 22. Defendant's May 2009 Monthly Supervision Report includes the following question: "Do you have a checking account(s)?" Monthly Supervision Report, Government Exhibit 52 (docket no. 127-3) at 42. Defendant checked the box next to "No." *Id.* Thus, even if Defendant had submitted an attachment to his May 2009 Monthly Supervision Report, such attachment would not cure the false statement that appears on the face of the report.

Furthermore, the court notes that, under several counts, Defendant failed to report a financial transaction or dealing even though there was space on the report for him to do so. For example, Count 40 charges Defendant with failing to disclose in his October 2008 Monthly Supervision Report that he wired $580 to Misty Burris. In Defendant's October

2008 Monthly Supervision Report, there is a space for Defendant to "[l]ist all expenditures over $500." *Id.* at 14. That instruction is followed by three spaces for Defendant to disclose such expenditures. *Id.* Defendant filled in two of those spaces—disclosing a house payment and car payment—but the third space is left blank. The court does not see why it would be necessary for Defendant to file an attachment to disclose his wire of $580 to Misty Burris. In fact, Defendant even demonstrated in another monthly supervision report that he did not feel confined by the number of spaces provided on the form. In his May 2009 Monthly Supervision Report, Defendant listed three expenditures on the three lines provided and then added a fourth expenditure in the space below the third line. *See id.* at 42.

Even for those counts where there was not enough space on the monthly report to disclose the relevant financial transaction or dealing, and, thus, it would be logical for Defendant to submit an attachment, a reasonable jury could find Defendant did not submit such attachments with his monthly supervision reports. Defendant contends that Officer Lupkes testified that there was no standard practice for submitting attachments, that she did not have personal knowledge as to whether Defendant submitted attachments because she did not supervise him and, finally, that she "readily acknowledged" that Defendant's attachments could have been lost. Brief in Support of Motion at 10. However, Officer Lupkes testified in detail regarding the practice of receiving reports and, contrary to Defendant's assertion, she testified that any instances of lost or misfiled attachments were rare. Thus, a reasonable jury could have found Officer Lupkes's testimony credible and found that such attachments were not submitted. *See Engler*, 521 F.3d at 973 (noting that a district court cannot disturb a jury's credibility finding); *see also Bradley*, 643 F.3d at 1125 (same). Furthermore, the court notes that the Second Superseding Indictment charged Defendant with providing false statements on thirteen different monthly

supervision reports. A reasonable jury could easily conclude that it was highly unlikely that the USPO would lose or misfile thirteen separate attachments.

Finally, the court declines to draw any inference from the government's failure to charge Defendant for other "absent [a]ttachments." Brief in Support of Motion at 10. Contrary to Defendant's assertion, the court does not believe that this "highlights further weaknesses," *id.*, in the government's case on Counts 37 through 49. Rather, it was an exercise of the government's considerable discretion in determining what charges to bring against a defendant. *See, e.g.*, *United States v. Kriens*, 270 F.3d 597, 602 (8th Cir. 2001) ("Prosecutors have broad discretion when making charging decisions."). Thus, the court finds that there was sufficient evidence for a reasonable jury to find that Defendant made false statements to the USPO as charged in Counts 37 through 49.

### C. Summary

For the foregoing reasons, the court finds that there is sufficient evidence to support the jury's guilty verdicts on Counts 1 through 8, 10 through 30 and 32 through 49. Accordingly, the court shall deny the Motion for Judgment of Acquittal.

## V. MOTION FOR NEW TRIAL

### A. Legal Standard

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court is granted broad discretion in considering a motion for a new trial. *Peters*, 462 F.3d at 957. A district court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)) (internal quotation mark omitted). However, the court "should grant a new trial only if 'the evidence weighs heavily enough against the verdict that a miscarriage of justice may have

occurred.'" *Peters*, 462 F.3d at 957 (quoting *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)).

A district court enjoys more latitude in granting new trials under Rule 33 than in granting motions for judgment of acquittal under Rule 29; however, "[m]otions for new trials based on the weight of the evidence are generally disfavored." *Campos*, 306 F.3d at 579. District courts "must exercise the Rule 33 authority 'sparingly and with caution.'" *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). The court's standard of review differs from the standard that is applied to a motion for judgment of acquittal.

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Lincoln*, 630 F.2d at 1319; *see also Johnson*, 474 F.3d at 1050-51 (reiterating applicable standard).

The district court's formulation of jury instructions is reviewed under an abuse of discretion standard to determine whether the instructions "'correctly state the applicable law.'" *United States v. Walker*, 428 F.3d 1165, 1171 (8th Cir. 2005) (quoting *United States v. Milk*, 281 F.3d 762, 768 (8th Cir. 2002)). A reviewing court will only grant a new trial based on erroneous jury instructions if the "abuse of discretion is prejudicial to one of the parties." *Id.*

### B. Analysis

Defendant raises five arguments in support of his Motion for New Trial. First, Defendant argues that the weight of the evidence as to Counts 1 through 8, 10 through 30 and 32 through 49 necessitates a new trial. Second, Defendant argues that the court erred by declining to instruct the jury on Defendant's good-faith defense. Third, Defendant contends that the court's definition of a "lulling" communication in Final Jury Instruction 13 was erroneous. Fourth, Defendant argues that the court had insufficient information to determine that Defendant voluntarily absented himself from the trial and, therefore, the court erred by continuing with the trial in his absence. Finally, Defendant argues that the court erred by admitting a factual stipulation. The court will address each argument in turn.

### 1. Weight of the evidence

For the same reasons discussed with respect to the Motion for Judgment of Acquittal, the court finds that the evidence did not "preponderate[] sufficiently heavily against the verdict[s]." *Lincoln*, 630 F.2d at 1319. The government presented overwhelming evidence of Defendant's guilt and no miscarriage of justice occurred. Accordingly, the court shall deny the Motion for a New Trial to the extent Defendant argues that the weight of the evidence necessitates a new trial.

### 2. Good-faith jury instruction

Next, Defendant contends that the court erred by failing to instruct the jury on his theory of the defense as to the wire fraud counts, namely, good faith. Regarding the Dibocca scheme, Defendant contends that there was evidence of good faith, specifically: (1) Dibocca is a real, patented game; (2) Defendant "underwent serious efforts in marketing the game," including ordering eighty felts and obtaining a "certification of the 'math' of the game"; (3) Falting had a licensing agreement similar to Bauer's agreement, although Bauer failed to promote the game as specified in his licensing agreement; and

(4) Bauer initiated his deal with Defendant. Brief in Support of Motion at 12. Regarding the mining scheme, Defendant contends that his good faith is evidenced by his attempts to purchase the mines, even though such attempts proved to be unsuccessful. Defendant specifically points to the fact that the jury found him not guilty on Count 9. The court finds that Defendant's arguments are unavailing.

"Defendants are entitled to a theory of defense instruction if it is timely requested, is supported by the evidence, and is a correct statement of the law . . . ." *United States v. Whitehill*, 532 F.3d 746, 752 (8th Cir. 2008). In this case, although Defendant timely requested a good-faith instruction, the court declined to give the requested instruction on the basis that it was not supported by the evidence. The court reaffirms its earlier decision. Regarding the Dibocca scheme, it is irrelevant whether Dibocca is a real game or whether Defendant intended to develop the game. *See United States v. Bailey*, 327 F.3d 1131, 1143 (10th Cir. 2003) ("[A]n honest belief by [the defendant] that everything would work out does not establish a good faith defense."); *United States v. Mabrook*, 301 F.3d 503, 509 (7th Cir. 2002) ("[The defendant's] good-faith belief that [his company] would eventually be successful is not relevant because that belief did not negate the falsity of his representations to his investors."). There was no evidence that Defendant acted in good faith when he solicited funds from Bauer and, contrary to his representations to Bauer, used those funds for his own benefit and the benefit of his family. Defendant's lack of good faith is underscored by his prior 2003 conviction for wire fraud, which involved nearly identical conduct, including a dice game scheme, which he failed to disclose to Bauer.

Regarding the mining scheme, the court again finds that there was no evidentiary support for a good-faith defense. Defendant stipulated to the existence of the scheme; specifically, he acknowledged that he did not own the Beverly Mine or the Cumberland Mine and that he had no mineral rights to these mines. He further stipulated that he

"cheated his investors and lenders out of at least $325,375." Factual Stipulation, Government Exhibit 16 at 4. Finally, in reference to Counts 12 and 13, Defendant stipulated that he made a number of false representations, including that Lee's money would be returned in twenty days with a 120% return and that, thanks to Lee's investment, he would be hauling ore from the Beverly Mine the following Saturday. The evidence at trial further established that Defendant represented to lenders that he owned or had mineral rights to the mines and that their funds would be used for the purpose of mining. Defendant, however, did not own or have mineral rights to the mines and he used the lenders' funds for his own benefit and the benefit of his family. Thus, the court finds that there is no evidentiary support for a good-faith defense regarding either the Dibocca or mining schemes.

Furthermore, the court finds that the Final Jury Instructions, as a whole, apprised the jury that it could not find Defendant guilty if he acted in good faith. In *United States v. Brown*, 478 F.3d 926, 928 (8th Cir. 2007), the Eighth Circuit reviewed a case in which the district court declined to give the defendants' requested good-faith instruction. As the Eighth Circuit noted:

> [T]he district court did instruct the jury that defendants had to act intentionally to join and participate in the conspiracy, that they must have voluntarily devised a scheme with intent to defraud the lenders, and that to be convicted of wire fraud, the defendant had to act "knowingly and with the intent to deceive."

*Id.* The Eighth Circuit went on to hold that the district court did not err in refusing to give the requested good-faith instruction because the "[t]he instructions given adequately insured that the jury appropriately considered [the good-faith] issue." *Id.*; *see also United States v. Ervasti*, 201 F.3d 1029, 1041 (8th Cir. 2000) (finding that, even if a good-faith instruction was warranted, the district court's refusal to give the requested instruction was

harmless error because the district court instructed the jury that the defendant must have willfully violated the tax laws).

In this case, the court instructed the jury that, to find Defendant guilty of wire fraud, the jury must find that he "voluntarily and intentionally participated in a scheme to defraud with knowledge of its fraudulent nature or devised or participated in a scheme to obtain money or property by means of material false representations or promises" and that he "did so with the intent to defraud." Final Jury Instructions (docket no. 115) 11 and 12 at 12, 14. The court further defined for the jury "scheme to defraud," "false" and "intent to defraud." *See* Final Jury Instruction 13 at 18. Thus, in finding Defendant guilty of Counts 1 through 8 and 10 through 30, the jury necessarily found that he did not act in good faith. *See Brown*, 478 F.3d at 928 ("'The essence of a good-faith defense is that one who acts with honest intentions cannot be convicted of a crime requiring fraudulent intent.'" (quoting *United States v. Sherer*, 653 F.2d 334, 338 (8th Cir. 1981))). The court, therefore, finds that the Final Jury Instructions, taken as a whole, advised the jury that it could not find Defendant guilty if he acted in good faith, "albeit without the actual words 'good faith.'" *Id.* Accordingly, the court shall deny Defendant's Motion for a New Trial to the extent it seeks relief on this ground.

### 3.    *"Lulling" definition*

Next, Defendant argues that the court erred when it declined Defendant's alternative definition of "lulling." Brief in Support of Motion at 13. Consistent with the government's proposed language and the language in Eighth Circuit Model Criminal Jury Instruction 6.18.1341, the court instructed the jury that, "Interstate wire communications which are designed to lull victims into a false sense of security, postpone inquiries or complaints or make the transaction less suspect are communications in furtherance of the scheme." Final Jury Instruction 13 at 19. Defendant, however, proposed the following language:

> Interstate wire communications which are designed to lull alleged victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect may be found to be communications in furtherance of the scheme, if you determine a scheme to defraud existed in the first place and the subsequent communications caused the alleged victims to change the way they would have otherwise acted.

Proposed Jury Instructions (docket no. 78) at 23-24 (emphasis removed). Defendant claims that his proposed instruction is more accurate than the instruction the court used because "[t]he crux of the lulling inquiry is whether subsequent communications are part of the scheme to defraud." Brief in Support of Motion at 13. The court disagrees.

As noted above, the elements of wire fraud are: (1) scheme to defraud; (2) intent to defraud; and (3) use of an interstate wire facility in furtherance of, or in an attempt to carry out, some essential step in the scheme. *See Farrington*, 499 F.3d at 859. Final Jury Instructions 11 and 12 laid out these three elements and further instructed the jury that it must find that the government proved all three elements beyond a reasonable doubt as to each count to find Defendant guilty of each count of wire fraud. Final Jury Instruction 13 further explained the elements listed in Final Jury Instructions 11 and 12 and provided definitions of "scheme to defraud" and "material." The court's "lulling" definition, which was also part of Final Jury Instruction 13, expanded on the third element of wire fraud—the use of an interstate wire facility. The definition, which was taken nearly verbatim from *Tackett*, 646 F.2d at 1243, does not detract from the jury's duty to find that a scheme to defraud existed. Insofar as Defendant is concerned that the jury could use the "lulling" communications as evidence that the scheme to defraud existed, Defendant does not cite any authority suggesting that the jury is prohibited from doing so. Thus, the court finds that its "lulling" definition is a correct statement of the law. The court shall deny Defendant's Motion for a New Trial to the extent it seeks relief on this ground.

## 4.       *Voluntary absence*

Defendant contends that the court had "insufficient evidence" to conclude that he voluntarily absented himself from the trial.  Brief in Support of Motion at 15.  Defendant argues that there was no evidence that he intentionally injured himself and, on the contrary, the evidence established that the injury was accidental.  Defendant points to the location of the injury (his chest), the fact that he told 911 responders that the injury was an accident and the lack of a suicide note.  The court finds that Defendant's arguments are unavailing and affirms its prior ruling.

The right to be present at all stages of one's trial is guaranteed by the Fifth and Sixth Amendments.  *See United States v. Ward*, 598 F.3d 1054, 1057-58 (8th Cir. 2010); *United States v. Treatman*, 524 F.2d 320, 323 (8th Cir. 1975).  This constitutional right is embodied in Federal Rule of Criminal Procedure 43, which provides that a "defendant must be present at . . . every trial stage, including jury impanelment and the return of the verdict."  Fed. R. Crim. P. 43(a); *see also United States v. Barth*, 424 F.3d 752, 762 (8th Cir. 2005) (discussing Rule 43).  Rule 43, however, further provides that a defendant waives his or her right to be present under certain circumstances, including "when the defendant is voluntarily absent after the trial has begun."  Fed. R. Crim. P. 43(c)(1)(A). The Eighth Circuit has held:

> In deciding whether to proceed with trial in the defendant's absence, the district court must make appropriate findings whether the defendant's absence is knowing and voluntary and, if so, whether the public interest in the need to proceed clearly outweighs that of the voluntarily absent defendant in attending the trial.

*United States v. Crites*, 176 F.3d 1096, 1097 (8th Cir. 1999) (citing *United States v. Wallingford*, 82 F.3d 278, 280 (8th Cir. 1996)) (finding that the defendant voluntarily absented himself when he "voluntarily took steps to end his life and to absent himself permanently from the trial proceedings"); *see also United States v. St. James*, 415 F.3d

800, 804 (8th Cir. 2005) (recognizing prior holdings that a suicide attempt may constitute a voluntary absence).

In this case, the court held a hearing to determine whether Defendant was voluntarily absent. At the hearing, the court heard from: defense counsel, who visited the hospital to investigate Defendant's injury; Officer Lupkes, who also visited the hospital and, pursuant to a medical waiver, spoke with Defendant's doctor and a social worker; and Officer Richard Dean Yoder, who responded to Defendant's 911 call. Additionally, the court spoke by telephone with Defendant's surgeon, and the court discussed the content of that conversation on the record before the parties. Following the hearing, the court made the factual finding that Defendant intentionally injured himself. The court based this finding on the improbability of accidental injury given the safety features of the nail gun. In addition, the court was skeptical of Defendant's story that he was installing trim in his laundry room very early in the morning and just hours before he was due in court, particularly in light of the fact that only a week earlier he claimed that he was in such poor health that he required twenty-four hour supervision. Adding to the court's skepticism was the fact that the nail with which Defendant injured himself was not appropriate for securing trim to drywall and the door frame. Finally, the court relied on Defendant's history of malingering, both in this case and in his prior 2005 case. *See* Resistance at 17-18 (listing examples of Defendant's various attempts to delay trial). After reviewing the evidence, the court affirms its prior ruling that Defendant voluntarily absented himself and, consequently, waived his right to be present at trial. Accordingly, the court shall deny Defendant's Motion for a New Trial to the extent it seeks relief on this ground.[9]

_____

[9] Although the court recognizes that Defendant has a right to be present at all trial stages, the court notes that Defendant was absent only during the record on the final jury instructions, the reading of the final jury instructions and the government's first closing argument. The court is mindful of the fact that Defendant was present and appeared to fully participate in jury selection, the presentation of evidence and defense's closing

(continued...)

### 5. *Admission of factual stipulation*

Finally, Defendant contends that the court erred by admitting Government Exhibit 16, a factual stipulation. On December 16, 2011, Defendant signed a plea agreement in which he agreed to plead guilty to wire fraud and making false statements to the USPO. A portion of the plea agreement was titled "Stipulation of Facts" and contained a summary of facts, with each paragraph initialed by Defendant. Factual Stipulation, Government Exhibit 16 at 1-6. After all parties signed the plea agreement, Defendant refused to enter a plea of guilty. The government subsequently filed a "Motion for Preliminary Ruling on Admissibility of Evidence" (docket no. 68), which sought a preliminary ruling on the admissibility of the Stipulation of Facts. Consistent with the precedent in the Eighth Circuit, the court determined that the Stipulation of Facts was admissible. *See* Order (docket no. 72). In his Brief in Support of the Motion, however, Defendant contends that "this case is distinguishable because of [his] challenge to admissibility on [Federal Rule of Evidence 403] grounds." Brief in Support of Motion at 16. The court disagrees. Defendant states nothing new in support of his argument, and the court already addressed Defendant's Rule 403 arguments in its prior Order. Thus, for the reasons stated in the court's prior Order, the court shall deny Defendant's Motion for a New Trial insofar as it requests a new trial on the basis that the court erred by admitting the factual stipulation.

### C. *Summary*

Thus, the court finds that the interests of justice do not require the court to grant Defendant a new trial, and, accordingly, the court shall deny the Motion for a New Trial.

## VI. *CONCLUSION*

In light of the foregoing, Defendant's Combined Motion for Judgment of Acquittal and New Trial (docket no. 140) is **DENIED**.

---

[9](…continued)
argument.

**IT IS SO ORDERED**.

**DATED** this 21st day of May, 2012.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA